UNITED STATES, Appellee,

v.

Gary P. NEAL, Defendant, Appellant.

UNITED STATES, Appellee,

v.

William F. KENNEY, Jr., Defendant, Appellant.

UNITED STATES, Appellee,

v.

Charles J. FLYNN, a/k/a Chucky, Defendant, Appellant.

Nos. 93–1298, 93–1334 and 93–1335.

United States Court of Appeals, First Circuit.

Heard May 2, 1994.

Decided Sept. 30, 1994.

Paul W. Pappas, Andover, MA, by Appointment of the Court, for appellant Gary P. Neal.

Michael J. Iacopino, by Appointment of the Court, with whom Timothy I. Robinson and Brennan, Caron, Lenehan & Iacopino, Manchester, NH, were on brief for appellant William F. Kenney, Jr.

Robert Sheketoff with whom Sheketoff & Homan, Boston, MA, was on brief for appellant Charles Flynn.

Robert J. Veiga, Asst. U.S. Atty., with whom Paul M. Gagnon, U.S. Atty., Concord, NH, was on brief for appellee.

Before SELYA and BOUDIN, Circuit Judges, and CARTER,* District Judge.

GENE CARTER, Chief District Judge.

Appellants Charles Flynn, William Kenney, and Gary Neal were found guilty by a jury on a number of criminal charges stemming from a series of armed robberies that took place in New Hampshire. Appellants challenge their convictions on the basis of various pre-trial, trial, and post-trial rulings issued by the court as well as statements made by the Government. We affirm on all but two of the issues raised by Appellants.

The first of these issues involves various Jencks Act requests made by Appellant Flynn. We find that the record indicates the

* Of the District of Maine, sitting by designation.

district judge may have applied an erroneous legal standard in ruling that various materials did not qualify as statements under the Jencks Act. Accordingly, we will remand to the district court for an evidentiary hearing to determine whether statements demanded by Appellant Flynn should have been disclosed under the Jencks Act and, if so, whether nondisclosure constituted harmless error. We also remand to the district court on the issue of the order of restitution entered against Appellant Neal with instructions that a hearing be held to determine whether the full amount of monetary losses suffered by First New Hampshire Bank was caused by the conduct underlying Neal's convictions.

At this point in the proceedings, we choose not to vacate the court's Jencks Act rulings or the order of restitution but instead remand to the district court for the limited purpose of making supplemental findings with regard to these two issues. In the interim, we will retain appellate jurisdiction so that we may review the court's augmented record and subsequent determinations.

### FACTUAL BACKGROUND

Appellants were tried by a jury in the District of New Hampshire during the months of October and November of 1992. The evidence presented and believed by the jury demonstrated that Appellants were involved, in varying capacities, in carrying out five armed robberies over a five-month period beginning with the armed robbery of a supermarket and ending in armed robbery of the First New Hampshire Bank ("First N.H.").[1] Appellants were tried on a thirty-two-count indictment charging them as follows:

*Counts 1 and 2* charged Appellants Flynn and Kenney with violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d), with each of the seven robberies alleged as predicate acts;

*Count 3* charged all three Appellants with conspiracy to commit robbery of First N.H. in violation of 18 U.S.C. § 371 and 18 U.S.C. § 2113(a) and (d);

*Counts 4 and 5* alleged that Appellants Flynn and Kenney committed armed and unarmed bank robbery of First N.H., in violation of 18 U.S.C. § 2113(d) and (a) and 18 U.S.C. § 2;

*Counts 6 through 15, 17, and 18* alleged conspiracy and interference with commerce by threats or violence, in violation of the Hobbs Act, 18 U.S.C. § 1951, with one or more counts corresponding to each of the seven robberies. Flynn was named in all counts; Kenney was named in counts 8 through 18;

*Counts 16 and 20 through 25* charged the use and carriage of firearms during and in relation to crimes of violence, in violation of 18 U.S.C. § 924(c)(1), with each count corresponding to one of the seven robberies. Flynn was named in all counts and Kenney was named in all counts except Count 20;

*Counts 19 and 26 through 29* charged possession of a firearm by a convicted felon, in

---

**1.** Appellants were initially indicted for committing seven crimes which included:

(1) the armed robbery of the Demoulas Market Basket, a supermarket in Portsmouth, New Hampshire, on April 13, 1991;

(2) the armed robbery of an employee of the Abercrombie and Finch restaurant as she was attempting to make a night deposit of $4800 at a Fleet Bank in North Hampton, New Hampshire on May 19, 1991; the jury rendered a not guilty verdict on counts involving this robbery;

(3) the armed robbery of an employee of a retail store called the Dress Barn while she was attempting to deposit $763 into the night deposit box at the First National Bank of Portsmouth, New Hampshire on June 7, 1991;

(4) the armed robbery on June 30, 1991, of an employee of Phantom Fireworks, Inc. in Seabrook, New Hampshire; counts involving this robbery were dismissed by the court;

(5) the armed robbery on August 3, 1991, of the home of James Fitzpatrick, the owner of a chain of stores known as Lighthouse Markets, Inc., in Hampton, New Hampshire;

(6) the armed robbery on August 17, 1991, of the person of James Fitzpatrick after he made his night rounds to collect receipts at each of his stores; and

(7) the armed robbery of the First N.H. in Stratham, New Hampshire on September 9, 1991.

violation of 18 U.S.C. § 922(g). Flynn was named in Count 19 only; Kenney was named in Count 26 only;

*Count 30* charged Appellant Neal as an accessory after the fact, in violation of 18 U.S.C. § 3;

*Count 31* charged money laundering against Appellants Neal and Flynn, in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 2; and

*Count 32* charged criminal forfeiture of a 1987 Nissan automobile against Neal and Flynn, in violation of 18 U.S.C. §§ 981 and 1956.

Government's Consolidated Brief at 3–6.

Appellants were initially charged with three other co-conspirators, Bruce Raineri, Brian Raineri, and Richard Ferguson. These three men pled guilty and cooperated to varying extents with the Government. Several other alleged co-conspirators, including Arthur Cosgro and Thomas McQueeney, also provided evidence against Appellants.

The evidence presented during the thirty-one-day trial is sufficient to justify the following conclusions of fact. Appellant Charles Flynn, a/k/a "Chuckie," was the leader and organizer of the group of co-conspirators. Flynn scoped out robbery locations, devised the plans, and recruited others to commit or assist in the crimes. Appellant William Kenney participated as the gunman and shared in proceeds of four robberies planned by Flynn, excluding the Market Basket robbery. Kenney also assisted Flynn in surveilling armored cars that serviced various stores and banks which were prospective robbery sites. Appellant Gary Neal played a more limited role in the overall conspiracy (this is reflected by the fact that he was indicted on only four counts and found guilty on two counts limited to the bank robbery).[2] The evidence demonstrated that Neal provided his home to the co-conspirators where they planned the bank robbery and took refuge after they committed the crime. Immediately following the robbery, Neal carried a box from the getaway car into his home containing the gun used in the bank robbery along with the stolen proceeds. He also used proceeds from the robbery to purchase a car in his name that was used by Flynn and Kenney to travel to Arizona and then to California in order to escape the scene of the crime. On their trip, Flynn and Kenney disposed of clothes used in the crime and stored the gun used in all five crimes in a garage belonging to Patricia Ferguson, a co-conspirator's relative.

On defendants' motions at the close of the evidence, the court dismissed RICO Counts 1 and 2, finding the Government failed to demonstrate a sufficient continuity of offenses. The court also dismissed Counts 12, 13, and 23, all involving the Phantom Fireworks robbery. The jury then rendered its verdicts, finding Flynn guilty on all remaining charges against him *except* Counts 8, 9, and 21, involving the night deposit robbery of an employee of Abercrombie and Finch restaurant. The jury found Kenney guilty on all remaining counts against him *except* for the counts involving the Abercrombie and Finch robbery and found Neal guilty of being an accessory after the fact and money laundering, as alleged in Counts 30 and 31, but not guilty on count 3, alleging conspiracy to rob First N.H.

## DISCUSSION

Appellants raise a litany of challenges against various rulings issued by the district court judge and statements made by the Government throughout the proceedings. The Court finds merit in Appellant Flynn's argument that both the Government and the district judge were operating under an improper legal standard in determining what statements qualified as Jencks Act material and should have been disclosed to the defense during trial. The Court also finds merit in Appellant Neal's argument that the court erred in ordering $266,500 in restitution against him for his role in the First N.H. robbery. These arguments will be treated first. The Court finds no merit in Appellants' remaining claims which will be discussed, in turn, in the order of joint challenges raised by Appellants followed by chal-

---

2. The four counts include conspiracy to commit bank robbery, accessory after the fact to bank robbery, money laundering, and criminal forfeiture.

lenges raised individually by Flynn, Kenney, and Neal.

## I. LEGAL STANDARD USED BY THE COURT AND GOVERNMENT IN DETERMINING WHAT EVIDENCE SHOULD BE DISCLOSED TO APPELLANT FLYNN

### A. Brady Claims

■ Appellant Flynn has framed much of his argument on appeal in terms of a *Brady* violation. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that a prosecutor's suppression of evidence favorable to and requested by a defendant violates due process where the evidence is material to guilt or to punishment). Appellant points to statements in the record indicating that the Government attorney harbored an erroneously narrow view of what materials were exculpatory and should have been disclosed to the defense pursuant to *Brady* and its progeny. Flynn acknowledges that the Government provided certain disputed materials to the trial court for *in camera* review. However, he argues that the Government's erroneous view of what qualified

as *Brady,* as a threshold matter, most likely resulted in the withholding of many other exculpatory materials from the court. He requests this Court to unseal the documents that were turned over, remand the case for further hearing in the district court, and order that the Government disclose all other *Brady* material in its possession.

A careful and thorough review of the record supports Appellant's assertion that the Government attorney misunderstood the reach of *Brady*.[3] However, in virtually every instance of dispute pointed out by Appellant and the Government, the Government attorney indicated on the record that *all* materials related to the witness in question were being turned over to the district judge for review.[4] Appellant makes no argument that the district judge erred in his understanding of *Brady,* other than pointing out that the judge never corrected the Government attorney when he mischaracterized *Brady*'s mandate. Our reading of the record satisfies us that the district judge conscientiously reviewed all materials in question. Because Appellant points to no other evidence to indicate that exculpatory evidence was withheld in violation of Appellant's Fifth Amendment right to

3. In one example of this misunderstanding, Appellant's counsel inquired whether any Brady material existed with respect to Richard Ferguson, a co-conspirator who cooperated with the Government. The Government attorney replied:
First of all, it's not Brady material. If it's anything, it's impeachment material, if it is even that.
Tr. (October 19, 1992) at 115. In a second incident, the Government attorney stated that:
Prior inconsistent statements are not Brady. I'll be happy at some point to give Mr. Wilson a lesson in the difference between Brady and impeachment material, but there is a difference all the way up to the United States Supreme Court.
Tr. (October 20, 1992) at 77.
These statements reflect a misunderstanding on the Government's part of the Brady rule. The Supreme Court has clearly stated that impeachment evidence may well qualify as Brady material. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). As the Court explained in *Giglio:*
When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within th[e] general rule [of Brady].
*Giglio,* 405 U.S. at 154, 92 S.Ct. at 766.

The significance of the Government's failure to appreciate the nature of exculpatory evidence under Brady is demonstrated by its evaluation of materials related to the witness James Fitzpatrick, who was testifying about a robbery of his home. Tr. (October 28, 1992) at 115. The court reviewed these materials, which the Government had claimed did not fall under Brady, and disclosed them to the defense because it found that the materials contained exculpatory evidence. *Id.* at 121. The defense was able to use the materials quite effectively in the cross-examination of Fitzpatrick. *Id.* at 123–24 and 126–44.

4. All materials were supplied for the court's review regarding *Brady* or Jencks Act requests with respect to witnesses Laura MacPherson, Tr. (October 8, 1992) at 119–21; Anita Ramsdell, *Id.* at 217; Richard Ferguson, Tr. (October 9, 1992) at 225–26, Tr. (October 14, 1992) at 153; Sergeant Coleman Forbes, Tr. (October 15, 1992) at 123, Tr. (October 16, 1992) at 142; Terrence Kinneen, Tr. (October 16, 1992) at 91; Douglas Scamman, Tr. (October 19, 1992) at 172–74; Arthur Cosgro, Tr. (October 20, 1992) at 74; Linda Sherouse, Tr. (October 27, 1992—afternoon session) at 87; Thomas McQueeney and Brian Raineri, Tr. (October 28, 1992) at 17, Tr. (November 2, 1992) at 3–4, Tr. (November 3, 1992) at 219–20; James Fitzpatrick, Tr. (October 28, 1992) at 115, 121.

a fair trial, we affirm the district court's Brady rulings.

## B. Disclosure Under the Jencks Act

■ Appellant's other argument, that the Government attorney too narrowly construed the reach of the Jencks Act, has much more bite because the record indicates that the district judge adopted the Government's misinterpretation and ruled against several Jencks Act requests on an erroneous legal ground. Before discussing the legal error in detail, it is necessary to consider the purpose and provisions of the Act.

■ The Jencks Act establishes procedures whereby a criminal defendant may exercise his limited right to obtain previous statements made by government witnesses that are in possession of the United States Government to be used for impeachment purposes. 18 U.S.C. § 3500. Subsections (a) and (b) of the Act provide that prior statements are not subject to disclosure until the witness has testified on direct examination and are available only to the extent that the statements relate "to the subject matter as to which the witness has testified." 18 U.S.C. §§ 3500(a) and (b). The Act further requires the defendant to make a motion for production. 18 U.S.C. § 3500(b). Subsection (e) defines "statements" subject to the Act as follows:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

At issue in this case is the reach of subsections (e)(1) and (e)(2) which first came into dispute on the third day of trial. 18 U.S.C.

§§ 3500(e)(1) and (e)(2). Appellant's counsel was conducting cross-examination of Laura MacPherson, a teller for First N.H. who had witnessed the bank robbery. MacPherson testified that while she was being questioned by police at the scene of the crime, an officer was taking notes based on what she was saying. Appellant's counsel then called for a sidebar requesting that the Government turn over these notes pursuant to the Jencks Act:

Court: It isn't [Jencks] unless she's seen it and adopted it.

Counsel: But if 18 3500 controls [18 U.S.C. § 3500], as I read it, a statement that is taken down by anybody, she doesn't have to adopt it. If it's a written statement taken down by a person dealing with the subject matter in question, I'm entitled to it. And I refer to 18 3500(e)(2).

Government: As I understand the application of the cited rule under Jencks, what counsel is referring to under (e)(2) is a mechanical recording or a transcription of a recording of some kind, either stenographic, mechanical, electrical, or other recording or transcription of that recording; that is, a transcript. There is no such material as the statement is defined under Jencks as I read the statute in that rule.

Court: That was my understanding of the interpretation of the statute, sir, and there are none of those stenographic recordings [or] transcriptions.

Tr. (October 8, 1992) at 118, 121–22.

While the Government attorney mentioned "other recording," it is clear from a reading of the entire interchange that the court and Government attorney disagreed with counsel's argument that subsection (e)(2) of the Jencks Act encompasses oral statements made by witnesses that are written down by government agents as they are taking notes on the conversation, so long as such statements are substantially verbatim accounts. Further, the trial record is replete with statements by the court indicating that it viewed subsections (e)(1) and (e)(2) as limited to statements that are either adopted by a witness or recorded through stenographic or some kind of mechanical means.[5]

5. *See* Appendix I for examples of various Jencks Act rulings by the court that were, or could

This legal basis, cited as the ground for many of the court's Jencks Act rulings, is erroneous. Since 1959, the United States Supreme Court has held that the phrase "other recording" in subsection (e)(2) "was meant to encompass more than mere automatic reproductions of oral statements." *Palermo v. United States*, 360 U.S. 343, 352, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287 (1959); 18 U.S.C. § 3500(e)(2). Following the Supreme Court's lead, this Court has stated that "[a] longhand writing which the court found fairly followed the witness' words, subject to minor, inconsequential errors" would fall within (e)(2). *Campbell v. United States*, 296 F.2d 527, 532 (1st Cir.1961), *on remand*, 199 F.Supp. 905 (D.Mass.1961), *and supplemental op.*, 303 F.2d 747 (1st Cir.1962), *vacated on other grounds*, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963) (Campbell II); *see also Campbell v. United States*, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961) (Campbell I) (finding that typed interview report prepared by FBI agent based on notes taken during a pretrial meeting with a government witness may qualify as Jencks Act statements under subsection (e)(1), if it was adopted by the witness, or subsection (e)(2), if the report closely followed notes that included verbatim statements); *United States v. Harris*, 543 F.2d 1247, 1250 (9th Cir.1976) ("handwritten or rough interview notes taken by a government agent during a criminal investigation" may contain substantially verbatim recitals of witness statements producible under the Jencks Act). The Supreme Court has indicated, however, that

Congress intended to limit subsection (e)(2) to:

> only those statements which could properly be called the witness' own words.... It [is] important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent.[6]

*Id.* 360 U.S. at 352–53, 79 S.Ct. at 1224–25.

In *United States v. Newton*, 891 F.2d 944, 953–54 (1st Cir.1989), this Court rejected an argument that the district court erred by not conducting an inquiry into whether disputed notes were "substantially verbatim" statements by the witness pursuant to 18 U.S.C. § 3500(e)(2). We rejected the argument on two grounds: first because Appellant failed to make a motion on the basis of that subsection to the court below and, second, there was no testimony in the record to indicate that "the agent [had been] recording the exact words of the witness." *Id.* at 954. In this case, however, Appellant's counsel elicited from a number of witnesses that agents had been taking notes as the witnesses were making statements; at sidebars, counsel specifically cited (e)(2) as the basis for his Jencks Act motions; and he registered, on the record, his disagreement with the court's and the Government's interpretation of the statute.

Appellant clearly raised this issue to the court below and on appeal. After examining the record, we find that the district judge likely ruled against a number of Appellant's Jencks Act requests on an erroneous legal

---

possibly have been, based on an erroneous legal ground. The examples in this Appendix are not meant to be exhaustive but only to point out on remand the more obvious rulings that were arguably based on legal error.

**6.** The remaining portion of this quotation in *Palermo* is worth citing here to provide the court below with guidance, on remand, in determining whether the disputed statements fall under subsection (e)(2) of the Act:

> Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear from the continuous congressional emphasis on 'substantially verbatim recital,' and 'continuous, narrative statements, made by the witness recorded verbatim, or nearly so ...'

that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation. We think it consistent with this legislative history, and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced. Neither, of course, are statements which contain the agent's interpretations or impressions.

*Palermo*, 360 U.S. at 352–53, 79 S.Ct. at 1224–25.

ground.[7] Rather than vacate the court's Jencks Act rulings, we choose to remand the case for the limited purpose of the taking of additional evidence while retaining appellate jurisdiction in the interim. We have previously noted the usefulness of such a limited remand, *see United States v. Levy*, 897 F.2d 596, 599 (1st Cir.1990) (endorsing limited remand for purposes of clarification where ambiguities lurk in the sentencing record), and have employed the practice in several cases. *See, e.g., U.S. v. Quiñones*, 26 F.3d 213, 219–20 (1st Cir.1994) (remanding for evidentiary hearing to determine whether sentencing departure was warranted while retaining appellate jurisdiction); *United States v. Parra–Ibañez*, 936 F.2d 588, 598 (1st Cir.1991) (remanding for evidentiary hearing to determine whether error during Rule 11 colloquy was harmless while retaining appellate jurisdiction), *remanded,* 951 F.2d 21 (1st Cir.1991).

On remand, the district court should hold an evidentiary hearing and report its findings back to us within ninety (90) days. The hearing should be limited to determining whether Appellant Flynn's motions for production, which were denied on the basis of the erroneous legal ground identified in this opinion, should have been granted, and documents produced, under the Jencks Act. We intimate no view on whether disclosure of any of these materials was required. The district court should conduct this hearing, applying the legal standards articulated in this opinion and limited to examining whether the disputed materials contain substantially verbatim recitals of witness statements as defined under subsection (e)(2). If the court determines that the materials in question do not contain producible statements or that the

nondisclosure of certain statements, while legal error, was harmless, it should supplement the record by setting forth its findings and explaining why a new trial is not required. If, on the other hand, the court concludes that the Government should have been required to deliver certain materials, or portions of materials, pursuant to subsection (e)(2), and that the error of nondisclosure was not harmless, it should vacate the judgment of conviction and grant Appellant Flynn a new trial.

## II. THE COURT'S ORDER OF $266,500 IN RESTITUTION AGAINST APPELLANT NEAL

■ Appellant Neal alone challenges the court's restitution order of $266,500 [8] to First N.H. pursuant to the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. §§ 3663, 3664. He argues that the district court erred, as a matter of law, by ordering him to pay full restitution of First N.H.'s losses from the robbery when those losses were not fully attributable to his offenses of being an accessory after the fact and money laundering. We review this claim of legal error *de novo. See United States v. Savoie*, 985 F.2d 612, 618 (1st Cir.1993).

■ In cases where a defendant has been convicted of specific federal offenses, section 3663 of the VWPA authorizes a sentencing court to order, "in addition to or ... in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a). The following section, 18 U.S.C. § 3664(a), directs the court to consider a number of factors, including loss sustained by the victim as a result of the offense, in determining the

7. In all honesty, this Court has not always been as clear as it should have been in pointing out the distinctions between 18 U.S.C. §§ 3500(e)(1) and (e)(2). In *United States v. Sepúlveda*, 15 F.3d 1161, 1179 (1st Cir.1993), this Court indicated that to be discoverable under the Jencks Act, a statement must be "substantially a verbatim account" *and* "signed or otherwise verified by the witness himself." The statements in question satisfied neither requirement. It is clear from a reading of the authorities cited in *Sepúlveda*, however, that this Court interprets the Jencks Act as requiring *either* a showing that the statement is a substantially verbatim account *or* that it was

adopted by the witness. *See, e.g., United States v. Newton*, 891 F.2d 944, 953–54 (1st Cir.1989) (concerning statement that arguably fell under 18 U.S.C. § 3500(e)(2)); *United States v. González–Sánchez*, 825 F.2d 572, 586–87 (1st Cir.), *cert. denied, Latorre v. United States*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987) (concerning statement that arguably fell under 18 U.S.C. § 3500(e)(1)).

8. Appellants Flynn and Kenney were also ordered to pay restitution to First N.H. in the amount of $266,500.

amount of restitution to be ordered against a defendant.[9] In *Hughey v. United States*, 495 U.S. 411, 413, 110 S.Ct. 1979, 1981, 109 L.Ed.2d 408 (1990), the United States Supreme Court interpreted these provisions as setting a maximum limit whereby restitutionary awards under the VWPA are not to exceed "the loss *caused by the specific conduct* that is the basis of the offense of conviction."

In objecting to the restitutionary award in proceedings below, Neal argued that he was compensated no more than $5000 by the armed robbers for assisting them in evading law enforcement officials and laundered about $14,000 of the robbery proceeds by purchasing a getaway vehicle that was later confiscated by the Government. In an order dated February 22, 1993, the district court summarily dismissed Neal's argument that he should not be required to make restitution in an amount greater than the proceeds that he personally obtained from the robbery. Order (Docket No. 302) at 3–4. While the court was correct in its view that the VWPA does not require restitutionary awards to be limited to the amount obtained by the defendant, the record gives no indication of whether the court calculated, pursuant to *Hughey*, the portion of First N.H.'s losses that *were actually caused by the specific criminal conduct forming the basis for Neal's convictions.*

■ The VWPA, itself, does not require the court to make explicit findings to justify restitutionary awards. This Court has held "that a district judge need not make open-court findings on the statutory factors when issuing a restitution order so long as the record on appeal reveals that the judge made implicit findings or otherwise adequately evinced his consideration of those factors." *Savoie*, 985 F.2d at 618. The record here indicates that the court ordered the same restitutionary amounts of $266,500 against Appellants Neal, Kenney, and Flynn. The record also indicates that in connection with the bank robbery, Kenney and Flynn were convicted of conspiracy to rob First N.H., conspiracy and interference with commerce by threats or violence in violation of the Hobbs Act, and the use of firearms during crimes of violence. Kenney was also convicted for possession of a firearm by a convicted felon in committing the bank robbery, and Flynn was convicted of money laundering. In comparison with Flynn and Kenney, Neal was convicted of being an accessory after the fact and money laundering. Given these factors indicating the disparate nature of Neal's criminal conduct, there is not an adequate basis in the record to determine whether the district judge found that *the full amount of losses suffered by First N.H.* was "caused by the specific conduct that [was] the basis of" Neal's convictions. *Hughey*, 495 U.S. at 413, 110 S.Ct. at 1981.

Such a determination was required in this case even though Congress amended certain provisions of the VWPA soon after the *Hughey* decision as part of the Crime Control Act of 1990. *See* Pub.L. No. 101–647, § 2509, 104 Stat. 4789, 4863 (1990). One of the amended subsections, codified at 18 U.S.C. section 3663(a)(2), expanded the definition of "victim" for purposes of restitution, providing in pertinent part that:

> a victim of an offense that involves *as an element* a scheme, a conspiracy, or a pattern of criminal activity means any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. section 3663(a)(2) (emphasis added). This broadening of the definition of "victim" appears to apply to cases involving mail fraud, racketeering, or other federal crimes that require proof of a scheme, conspiracy, or pattern of criminal conduct. This Court faced such a case in *U.S. v. Cronin*, 990 F.2d 663 (1st Cir.1993) and decided that where defendants had committed various mail fraud offenses *prior to* enactment of section 3663(a)(2), restitution should be limited to the amounts alleged in the specific counts on which each defendant was found

---

9. 18 U.S.C. § 3664(a) directs the court to consider the following factors:

 ... the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

guilty and not awarded for the full amount of losses stemming from the mail fraud scheme of which each defendant was a part.

While the bank robbery alleged in the indictment in this case occurred *subsequent to* the VWPA amendments, section 3663(a)(2) does not appear to support the restitutionary award entered against Appellant Neal. Neal was convicted of money laundering and of being an accessory after the fact. Neither of these offenses involves proof of a scheme, conspiracy or pattern of criminal activity as an element. *See* 18 U.S.C. section 1956 (laundering of monetary instruments) and 18 U.S.C. section 3 (accessory after the fact).

Accordingly, we remand the case with instructions that the court hold a hearing to determine whether the full amount of damages suffered by First N.H. are attributable to the conduct underlying Appellant's convictions.[10] We leave the dimensions of the hearing, as well as the necessity *vel non* for taking additional evidence, in the sound discretion of the district court. Similar to the limited remand that we ordered with respect to Appellant Flynn's Jencks Act challenge, *see* pp. 1198–1199 *supra,* we will retain appellate jurisdiction and order the court to report its findings to us within ninety (90) days. If the court determines that the full amount of First N.H.'s damages were caused by Appellant's criminal conduct, it should supplement the record with these findings. If the court concludes that the full restitutionary award is not supported by facts presented at the evidentiary hearing, it should vacate the award and enter a new restitutionary order based upon a determination of that amount of damages suffered by First N.H. which is attributable to the conduct underlying Appellant's convictions.

## III. JOINT CHALLENGES

### A. The Court's Failure to Define Reasonable Doubt

■ Appellants Flynn, Kenney, and Neal argue that the court's jury instructions, which failed to define the term "reasonable doubt" and used the phrase "by medium of admissible evidence," [11] violated their due-process rights to a fair trial and undermined confidence that their convictions rested upon proof comporting with the constitutional minimum.

■ This Court has clearly held that "an instruction which uses the words reasonable doubt without further definition adequately apprises the jury of the proper burden of proof," so long as the phrase is not buried as an aside. *United States v. Olmstead,* 832 F.2d 642, 646 (1st Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1739, 100 L.Ed.2d 202 (1988). This Court is satisfied that the instructions rendered in this case fully satisfy constitutional requirements and comply with *Olmstead.*[12] The judge reiterated the gov-

---

10. We do not mean to suggest that on remand there is no possible basis for holding Neal accountable for the full amount of losses suffered by First N.H. We are only suggesting that the record, as it stands, does not indicate whether, and upon what evidentiary basis, the trial judge determined that the full amount of losses are attributable to Neal's criminal conduct. If on remand, for example, evidence is presented indicating that Neal played a significant role in helping the other defendants escape and that but for his actions, there was a substantial likelihood that the full proceeds would have been recovered, the court could well be within its statutory authority in imposing the full $266,500 in restitution.

11. The district court judge used this phrase in the following context:

The law in the United States of America presumes each defendant to be innocent of crime, and this presumption of innocence can be overcome only when the government, *by medium of admissible evidence,* satisfies its burden of convincing the jurors beyond a reasonable doubt of the guilt of each defendant as to every element of the offense with which that defendant has been charged.

12. In addition to the instructions listed in n. 11, *supra,* the court further instructed the jury as follows:

Moreover, the law never imposes upon a defendant the burden or duty of testifying or producing any evidence, so a reasonable doubt may arise not only from the evidence produced but also from a lack of evidence. The government must prove beyond a reasonable doubt as to each defendant every essential element of the offense with which that defendant is charged. Each defendant has the right to rely upon the failure of the prosecution to establish such proof, and each defendant may also rely upon evidence brought out on cross-examination of witnesses presented by the prosecution.

ernment's burden of proof a number of times; explained that the government must satisfy this burden with respect to each element of the offense with which each defendant is charged; and told the jurors to consider the evidence separately and impartially against each defendant. *See* n. 12, *supra.* When read in context, the phrase "by medium of admissible evidence" would be interpreted by a reasonable juror to mean that the government must satisfy its burden of proof *through* admissible evidence.[13]

Appellants ask the Court to reconsider its holding in *Olmstead* in light of recent Supreme Court decisions. The opinions cited by Appellants, however, do nothing more than provide support for *Olmstead.* The cases all involve judicial attempts to define reasonable doubt and recognize that attempts to imbue the phrase with exact definition are fraught with pitfalls. *See, e.g., Victor v. Nebraska,* — U.S. —, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (holding that instructions, taken as a whole, correctly conveyed the concept of reasonable doubt despite the use of such terms as "moral evidence", "moral certainty," and "substantial doubt"); *Sullivan v. Louisiana,* — U.S. —, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (holding that a constitutionally deficient in-

struction defining reasonable doubt cannot be harmless error); *Cage v. Louisiana,* 498 U.S. 39, 41, 111 S.Ct. 328, 329, 112 L.Ed.2d 339 (1990) (holding that a defendant's due-process rights were violated where a judge instructed jurors that reasonable doubt was equivalent to a "grave uncertainty" and an "actual substantial doubt" and that jurors could convict if morally certain of a defendant's guilt).

In *Victor v. Nebraska,* — U.S. at —, 114 S.Ct. at 1248, Justice O'Connor noted that the court did not condone the use of such terms as "moral certainty" in defining reasonable doubt but went on to find that the instructions placed the terms in a context correctly conveying the quantum of proof necessary for a finding of guilt. She also noted that:

> [T]he Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course (citation omitted). Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt, (citation omitted), the Constitution does not require that any particular form of words be used in

---

The court then concluded its instructions as follows:

> To sum up then, you should treat each charge made with respect to each defendant separately and give to each of such charges the same careful and thorough consideration you would wish to have given to each of you were you charged with the offenses set forth in this indictment. As I have indicated to you, the burden in each instance which is placed upon the government is to prove each element of the offenses with which each defendant is charged beyond a reasonable doubt, and in the event the government fails to sustain its burden of proof beyond a reasonable doubt as to any essential element of any offense charged against each defendant, it has failed in its burden of proof as to each defendant and that defendant is to be acquitted.... So, if any reasonable doubt remains in your minds as to the guilt of any defendant after impartial consideration of all of the evidence with respect to such defendant, it is your duty to find that defendant not guilty. You should analyze what the evidence in the case shows with respect to each element of each offense charged against each defendant and determine the issue as to whether the government has sustained its bur-

den of proof with respect to each such element.

13. The first definition of "medium" found in Webster's dictionary is "something in a middle position" or "a middle condition or degree." The second definition is "a means of effecting or conveying something." *Webster's Ninth New Collegiate Dictionary* (1987).

Appellants argue that the trial court's instructions led jurors to interpret "medium" along the lines of the first definition. We note that during the Rule 30 sidebar regarding objections to the instructions, Appellants did not request that the district court clarify the sense in which it used the word "medium." In addition, we find that a reasonable juror would have interpreted "medium" in accordance with the second definition where the judge used "beyond a reasonable doubt" in the same sentence and made clear that the latter standard represented the Government's burden of proof:

> this presumption of innocence can be overcome only when the government, by medium of admissible evidence, satisfies its burden of convincing the jurors beyond a reasonable doubt of the guilt of each defendant as to every element of the offense with which that defendant has been charged.

advising the jury of the government's burden of proof (citation omitted).

*Victor*, —— U.S. at ——, 114 S.Ct. at 1243.

Because we find that nothing in the Supreme Court cases cited by Appellants brings into question the holding in the *Olmstead* case, we affirm the district court's instructions.

### B. Sufficiency of Evidence Supporting Guilty Verdicts of Flynn and Kenney on Counts Involving the Dress Barn Robbery

■ Appellants Flynn and Kenney challenge the sufficiency of the evidence supporting their guilty verdicts on Counts 10, 11, and 22, involving the robbery of a Dress Barn employee while she attempted to deposit about $763 into a night deposit box. Counts 10 and 11 alleged that Flynn and Kenney conspired and interfered with commerce by threats or violence in committing the Dress Barn robbery in violation of the Hobbs Act, 18 U.S.C. § 1951. Count 22 involved the use and carriage of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1).

■ In reviewing a sufficiency-of-the-evidence claim, the Court must view the facts in the light most favorable to the Government, deferring to the jury's verdict if the evidence can support varying interpretations, at least one of which is consistent with the defendant's guilt. *United States v. Browne*, 891 F.2d 389, 393 (1st Cir.1989). Viewed in this light, the evidence must be of such a quantum that a reasonable trier of fact *could* find guilt beyond a reasonable doubt but the evidence need not compel such a finding. *Id.*

As the basis for their challenge, Appellants point primarily to inconsistencies in identification testimony between the bank employee and co-conspirator Thomas McQueeny. The bank employee testified that the robber was wearing a white styrofoam woodworker's mask that stood out from his face and that he was wearing a Patagonia jacket and a pair of jeans. McQueeney, on the other hand, indicated that Kenney was wearing a white painter's mask made of cloth and a blue runner's suit.[14]

Viewed in the light most favorable to the Government, the identification testimony supports the jury's guilty verdict. McQueeney indicated that he dropped Kenney off with a white painter's mask and a gun near the scene of the robbery; the employee testified that her assailant was wearing a white carpenter's mask and carrying a gun similar to Government Exhibit 42. McQueeney also supplied evidence of conspiracy, testifying that Flynn watched as Kenney tried on the mask, directed McQueeney to drop Kenney off near First National Bank, and argued with Kenney the following morning for targeting women with only $600. Kenney later admitted to co-conspirator Ferguson that he robbed some night depositories. While the evidence may not *compel* guilty verdicts, this Court finds that it is of a sufficient *quantum* that a reasonable trier of fact could find Appellants guilty beyond a reasonable doubt on the counts involving the Dress Barn robbery. Hence, the Court affirms Flynn's and Kenney's convictions on Counts 10, 11, and 22.

### C. The Court's Denial of Flynn's and Kenney's Motions to Set Aside Verdicts and to Grant New Trial

■ Appellants Flynn and Kenney argue that the district court abused its discretion by denying their motions to set aside verdicts and to grant a new trial, arguing that joinder

---

**14.** The remaining evidence consisted of additional testimony by McQueeny who stated that he and Flynn watched Kenney try on a white cloth painter's mask and that, at Flynn's request, he dropped Kenney off near First National Bank on the night of the robbery carrying a bag with the mask, the gun, and the gloves. He also testified about an argument the next morning during which Flynn scolded Kenney for robbing women with only $600. The employee was unable to identify Kenney but was able to testify to his approximate height and age. She also testified that he carried a handgun similar to the semi-automatic admitted by the Government as Exhibit 42 and that the stolen proceeds belonged to a business involved in interstate commerce. Co-conspirator Brian Raineri testified, indicating that he had discussions with Flynn on how to rob night depositories, and co-conspirator Richard Ferguson testified that Kenney later admitted to robbing a couple of night depositories.

of charges against them resulted in prejudice, pursuant to Fed.R.Crim.P. 14.[15] Appellants argue that joinder was initially proper but became prejudicial when the district court dismissed the RICO counts at the close of the Government's case for failure to establish a pattern of racketeering activity. Assuming that initial joinder was proper under Fed.R.Crim.P. 8(b),[16] the district court has considerable latitude in treating motions based on prejudicial joinder under Rule 14, and "its resolution of severance questions will be overturned only if that wide discretion is plainly abused." *United States v. Natanel,* 938 F.2d 302, 308 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992); *see also United States v. McLaughlin,* 957 F.2d 12, 18 (1st Cir.1992) ("We review a trial court's denial of a severance motion for abuse of discretion and reverse only if denial deprived defendant of a fair trial, resulting in a miscarriage of justice").

■ When severance has been refused, appellants shoulder the burden of making a strong showing of prejudice that the joinder of offenses or defendants served to deprive them of a fair trial. *Id.; Natanel,* 938 F.2d at 308 (citing *United States v. Porter,* 764 F.2d 1, 12 (1st Cir.1985)). Appellants argue that prejudice resulted because the jury was exposed to certain evidence that would otherwise have been inadmissible against them without the RICO counts. They specifically point to testimony by officials of the New Hampshire State Police who observed them on numerous occasions surveilling armored trucks in preparation for the First N.H. robbery. Appellants argue that this testimony would not have been admitted but for the RICO counts and that it prejudiced the jury in considering the remaining counts against them. The admissibility of the surveillance testimony, however, was not limited to the RICO counts, as Appellants argue, but was relevant to Counts 3, 4, 5, 16, 17, 18, and 19, involving conspiracy to commit bank robbery and other bank robbery charges. Appellants also give no clear indication, other than conclusory statements, of how this surveillance testimony was so material and significant as to make a prejudicial finding likely on other unrelated counts.

Appellants make a more general "spillover" argument, asserting that evidence admitted at trial relating to the whole series of robberies linked by the RICO counts made it impossible for the jury to consider each defendant and each offense separately. "There is always some prejudice in any trial where more than one offense or offender are tried together—but such 'garden variety' prejudice, in and of itself, will not suffice." *United States v. Boylan,* 898 F.2d 230, 246 (1st Cir.1990). Here, the district court sought to minimize the possibility of prejudice by giving limiting instructions in the course of trial and instructing the jury at the beginning and end of the closing charge to consider the evidence against each defendant separately

---

**15.** Fed.R.Crim.P. 14 provides in relevant part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election of separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires....

**16.** Because Appellants do not argue that initial joinder was improper and did not move for severance of offenses or defendants before trial, their appeal does not implicate Fed.R.Crim.P. 8(b). *See* Appellant Kenney's Brief at 27 (stating that joinder in the present case was proper at the commencement of trial). Fed.R.Crim.P. 8(b) provides:

> **Joinder of Defendants.** Two or more defendants may be charged in the same indictment

or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

The Court will note only that initial joinder is generally held to be proper where, as here, the indictment includes RICO counts that link all defendants to the conspiracy, *United States v. Zannino,* 895 F.2d 1, 16 (1st Cir.1990), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990), and "[embrace] all of the acts and transactions upon which the other ... counts [are] based." *United States v. Boylan,* 898 F.2d 230, 245 (1st Cir.1990), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990) (quoting *United States v. Tashjian,* 660 F.2d 829, 833 (1st Cir.), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981)).

with respect to each count of the indictment. *See* nn. 11 & 12 *supra*. That the jury was able to follow these instructions is demonstrated by its selective verdict,[17] which provides "reasonably good assurance that no injurious spillover effect occurred." *Natanel*, 938 F.2d at 308. The Court also notes that evidence at trial was presented in a compartmentalized fashion to assist the jury in distinguishing between the various crimes and defendants; *i.e.*, the first fifteen days of trial covered the First N.H. robbery while successive days treated each of the other predicate acts in turn.

Finding no abuse of discretion, the Court affirms the trial court's denial of Appellants' motions to set aside the verdicts and for a new trial.

## IV. CHALLENGES RAISED SEPARATELY BY FLYNN

### A. The Court's Denial of Motion for Continuance

■ Appellant Flynn challenges the court's denial of his motion for continuance of trial to enable him to seek retained counsel, filed on September 25, 1992, as well as the court's refusal of his motion to reconsider, filed on the first day of trial, October 5, 1992. This Court will review the denial of Flynn's motion for abuse of discretion. *United States v. Machor*, 879 F.2d 945, 952 (1st Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043, 493 U.S. 1094, 110 S.Ct. 1167, 107 L.Ed.2d 1070 (1990).

The record indicates that Flynn first requested, and was granted, the right to seek retained counsel on May 28, 1992, after withdrawing his motion to represent himself *pro se*. Flynn failed to retain counsel in the time allotted and on June 18, appeared before a magistrate judge in a hearing on the Government's motion to have counsel appointed for him. Flynn told the magistrate that he still

desired to seek retained counsel and mentioned the names of two possible lawyers. The magistrate granted the Government's motion and appointed as Flynn's counsel Attorney Lawrence Gillis, who entered his appearance on July 6, 1992. This action by the court in no way interfered with Flynn's continued efforts to retain outside counsel.

On September 1, 1992, the district court granted Flynn's motion for continuance of trial, giving him one deadline, which lapsed, and extending it again until September 18 to enable Flynn to retain private counsel.[18] Five days after the deadline, on September 23, Attorney Barry Wilson filed a motion to enter his appearance as Flynn's counsel and, on September 25, filed a motion to continue the October trial date until January of 1993, to give him time to prepare for trial. The district court denied the September 25 motion as well as a motion, filed on the first day of trial, to reconsider its ruling, finding that:

> Flynn's maneuvers with respect to counsel are such as to equate with a waiver of his right to choose counsel.... The court fully understands the difficulties imposed on Attorney Gillis by Mr. Flynn's refusal to date to cooperate with him, but it behooves Mr. Flynn to now sit down with his appointed counsel and to assist him in the presentation of his defenses.

September 28, 1992, Order (Docket No. 187) at 3–4. Trial continued as scheduled, beginning on October 5, 1992, *except that* Attorney Gillis withdrew and Attorney Wilson took over as Flynn's retained counsel.

■ The Sixth Amendment guarantees a defendant the right to assistance of counsel, which includes the right to counsel of one's choice. *United States v. Hallock*, 941 F.2d 36, 44 (1st Cir.1991). While the right to effective assistance is absolute, this Court has long held that a defendant's right to choose a particular counsel must be weighed against administration-of-justice

---

17. The jury found Appellants not guilty on Counts 8, 9 and 21, involving the night deposit robbery of a restaurant employee, but guilty on counts involving the five remaining robberies. Finding Appellant Neal guilty of money laundering and accessory after the fact, the jury found him not guilty of conspiracy to rob First N.H.

18. Flynn's motion was based on an affidavit filed by Gillis alleging a total breakdown in communication with his client because Flynn refused to cooperate with him in preparing a defense.

concerns and "cannot be insisted upon in a manner that will obstruct reasonable and orderly court procedure." *United States v. Poulack,* 556 F.2d 83, 86 (1st Cir.), *cert. denied,* 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977); *see also Hallock,* 941 F.2d at 44; *Machor,* 879 F.2d at 952; *Tuitt v. Fair,* 822 F.2d 166 (1st Cir.), *cert. denied,* 484 U.S. 945, 108 S.Ct. 333, 98 L.Ed.2d 360 (1987).

In light of these factors, this Court does not find that the district court abused its discretion in denying Flynn's motion for continuance. In essence, Flynn had nearly four months to secure private counsel—from May 28, 1992, until September 18, 1992. The trial date was continued for one month at his behest; yet he continually failed to meet deadlines set by the court. Given these circumstances, the Court affirms the denial of Flynn's belated September 25 motion for continuance and his later motion to reconsider.[19]

### B. The Court's Admission of Bank Employee's Testimony and Its Denial of Appellant's Motion for Judgment of Acquittal on Bank Robbery Counts

▮ Appellant argues that the district court improperly admitted the testimony of bank employee Debbie Haskins, who testified with respect to First N.H.'s federally insured status and its involvement in interstate commerce. Appellant also challenges the sufficiency of the evidence in support of the jury's guilty verdicts on the bank robbery counts.

Appellant first argues that Haskins' testimony should not have been admitted because she lacked personal knowledge of the bank's FDIC status or its involvement in interstate commerce as required by Fed.R.Evid. 602 (witness may not testify to a matter without evidence that she had "personal knowledge of the matter"). In particular, Appellant argues that Haskins, who worked as an insurance compliance specialist for First N.H., did not commence her employment until a month after the robbery, so her testimony was based on records that she was exposed to in the course of her later employment and not on knowledge formed at the time of the robbery.

Evidence is inadmissible under Rule 602 "only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testified to." *Hallquist v. Local 276, Plumbers & Pipefitters Union,* 843 F.2d 18, 24 (1st Cir.1988). Personal knowledge can include "inferences and opinions, so long as they are grounded in personal observation and experience." *United States v. Doe,* 960 F.2d 221, 223 (1st Cir. 1992). Haskins testified that her job brought her into contact with records, including certificates provided by the FDIC, which indicated that the Stratham, New Hampshire branch of First N.H. was federally insured, although she had not personally seen such a certificate posted at the branch on the date of the robbery. She also testified that bank records to which she was exposed indicated that the branch had customers in Vermont and Massachusetts and a correspondent banking account in Massachusetts. This Court finds that the district court did not abuse its discretion in admitting Haskins' testimony because it was limited to information that she actually perceived or observed as an insurance compliance specialist and did not attest to circumstances beyond her personal knowledge.[20]

▮ Appellant also argues that the guilty verdicts on the bank robbery counts were not supported by a sufficiency of the evidence with respect to the elements of FDIC insurance status and involvement in interstate

---

**19.** The Court notes that while Flynn's belated motion for continuance was denied, Attorney Wilson still conducted his representation at trial.

**20.** Appellant's argument that Haskins' knowledge was not formed on the basis of information that she possessed on the date of the robbery may have diminished the value of her testimony, but such an argument does not implicate Rule 602. " 'The extent of a witness' knowledge of matters about which he offers to testify goes to the weight rather than the admissibility of the testimony.' " *Hallquist,* 843 F.2d at 24 (quoting *Nielson v. Armstrong Rubber Co.,* 570 F.2d 272, 277 (8th Cir.1978)).

commerce.[21] As the Government points out, Appellant moved for judgment of acquittal on these counts on the basis of other arguments and did not argue below that dismissal should be granted on the above-cited grounds. Consequently, Appellant has waived this argument on appeal unless the bank robbery convictions are "clearly and grossly unjust." *United States v. López*, 709 F.2d 742, 746 (1st Cir.), *cert. denied*, 464 U.S. 861, 104 S.Ct. 187, 78 L.Ed.2d 166 (1983).

Even under the less rigorous standard governing sufficiency-of-the-evidence claims, however, we affirm the convictions. The evidence, viewed in the light most favorable to the Government, could have persuaded a rational trier of fact beyond a reasonable doubt that First N.H. was FDIC-insured and involved in interstate commerce.[22] Hence, the district court's denial of Flynn's motion for acquittal on the bank robbery counts is affirmed.

### C. The Court's Denial of Motion to Sever Count 19 Charging Possession of Firearm by Convicted Felon

Appellant challenges the district court's denial of his motion to sever Count 19 as an abuse of discretion, arguing that the inclusion of his prior felony history resulted in clear prejudice and denied him a fair trial. Appellant moved for severance under Fed. R.Crim.P. 14, which provides, in part, that if it appears a defendant may be prejudiced by joinder of offenses, the court may "order an election of separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires...." Trial courts are granted discretion under Rule 14 to take whatever steps are deemed necessary to minimize prejudice; "[s]everance is only one remedy—and certainly the most extreme—in the federal courts' remedial arsenal." *United States v. Daniels*, 770 F.2d 1111, 1120 (D.C.Cir.1985).

Here the record indicates that in ruling on Flynn's motion on the first day of trial, the court declined severance but decided not to disclose the details of Flynn's prior conviction(s) in reading Count 19 to the jury. Flynn's counsel later indicated that he would stipulate to his client being a convicted felon and stipulate that the court could instruct the jury in that regard. In its final instructions to the jury, the court indicated that the parties had stipulated to the fact of the prior conviction(s), without detailing the nature of the criminal acts at issue in them.

The Court finds that the district court did not abuse its discretion in deciding not to sever Count 19 and in opting instead to limit the jury's exposure to the details of Flynn's prior criminal history.

### D. Statements Made During Prosecutor's Closing Argument

Appellant asserts that the Government prosecutor made improper comments during his closing argument in which he allegedly injected his personal opinion and referred to facts outside the record regarding the truthfulness of Government witnesses. This Court has long held that a prosecutor may not place the prestige of the government behind a witness by making personal assurances about the witness' credibility nor indicate that facts not before the jury support the testimony. *See, e.g., United States v. Martin*, 815 F.2d 818, 821–22 (1st Cir.1987), *cert. denied*, 484 U.S. 825, 108 S.Ct. 89, 98

---

**21.** Proof beyond a reasonable doubt that the Federal Deposit Insurance Corporation insured the deposits of First N.H. is an essential element of the crimes alleged in Counts 3, 4, and 5, regarding the robbery of First N.H. in violation of 18 U.S.C. § 2113. Proof beyond a reasonable doubt that robbery of First N.H. had some effect on interstate commerce is an essential element of the Hobbs Act violations alleged in Counts 16, 17, and 18. 18 U.S.C. § 1951.

**22.** In addition to Haskins' testimony, the Government introduced into evidence a certified copy of the records of the FDIC establishing that after a diligent search of the agency's records, no evidence was found to indicate that First N.H.'s insured status was ever terminated on or before the date of the September 9, 1991, robbery. Further, Haskins' testimony regarding First N.H.'s interstate accounts was augmented by the testimony of another bank employee, Anita Ramsdell, who was in charge of opening new accounts, teller supervision, and maintenance of the bank vault. According to Ramsdell, the bank sold vault money to the Federal Reserve Bank of Boston and on the morning of the robbery, the vault contained a large amount of money that was about to be shipped there.

L.Ed.2d 51 (1987); *United States v. Rosa*, 705 F.2d 1375, 1379–80 (1st Cir.1983). Appellant specifically points to the following comments to support his argument of prosecutorial misconduct:

*Comment 1:* Much comment has been made about deals. It would seem to me that a 17–year stretch in prison isn't much of a deal.

*Comment 2:* Believe me. Richard Ferguson remembers what he remembers. So does Arthur Cosgro. So does Tom McQueeny. So does Brian Raineri. So do all the other witnesses in the case. Sometimes they don't match with each other. Sometimes they don't match with other people at the offenses. And that's fine. They're telling what they remember. These guys, as somebody said, are not great abstract thinkers. I think we can all agree to that.... Which is it?.... Do we know? No, we don't know. We can choose to believe which of those is accurate or who remembers better.

*Comment 3:* These people believe, rightly or wrongly that they might have had some criminal exposure. Even if they did, I think we can all agree it's substantially less than the individuals who are charged with the crimes in this indictment.

■■■ Comment 2 was not the subject of contemporaneous objection and will be treated first. Absent plain error, the failure to object during the prosecutor's argument forecloses appellate review. *United States v. Morales–Cartagena*, 987 F.2d 849, 854 (1st Cir.1993) (stating that plain-error standard requires reversal of a conviction *only if* a "miscarriage of justice would otherwise result"). This Court does not find plain error. Other than the phrase, "Believe me," which appears to be an expression of personal opinion only if read out of the total context, the

prosecutor's comment does not improperly vouch for the credibility of Government witnesses. The comment merely points out that the witnesses, telling the story as they remember it, have generated a number of inconsistencies in the record and that it is up to jury to resolve these issues.[23]

■■■ The Court finds likewise that comment 1 falls within permissible boundaries. When read in context, the phrase "it seems to me" does not amount to improper vouching for the credibility of a Government witness because the comment is limited to the terms of the plea agreement. "It is not error to inform a jury of the contents of a plea agreement, nor is it improper for the government to call attention to a witness' motivation for testifying." *United States v. Dockray*, 943 F.2d 152, 156 (1st Cir.1991).[24] Especially here, where the record indicates that defense counsel focused much of their cross-examination and closing arguments on the benefits to be bestowed on cooperating co-conspirators, the comment that "a seventeen-year stretch in prison isn't much of a deal" does not amount to prosecutorial misconduct. *See Martin*, 815 F.2d at 822 (finding no prosecutorial misconduct where prosecutor told jury that each of the Government witnesses expects to go to jail; "[t]he Government is going to recommend substantial jail, the maximum penalty is five years, and even with good time off, five years, four years in a Federal Penitentiary, that's no walk in the park").

■■■ Appellant argues that in making comment 3, the prosecutor improperly interjected his personal opinion that Appellant was guilty and asserted that all other trial witnesses agreed with the Government's assessment. Appellant's interpretation of comment 3 is far-fetched. The most this Court

---

**23.** Even if a contemporaneous objection had been made, comment 2 still does not rise to error sufficient to warrant a new trial. *See, e.g., United States v. Rodríguez–Estrada*, 877 F.2d 153 (1st Cir.1989) (where prosecutor explicitly assured jury that witness would tell truth, error not reversible because it was counterbalanced by other statements of prosecutor telling jurors there was conflicting evidence on issues testified to by witness and reminded jury that they should determine issues of demeanor and credibility).

**24.** Appellant suggests that this comment misrepresented the plea agreement of Arthur Cosgro, who testified that the Government promised to recommend eight years at sentencing. This Court agrees with the Government, however, that the comment actually referred to the plea agreement of Richard Ferguson, who testified that the prosecution would recommend seventeen years.

can glean from the comment is that (1) the Government witnesses were motivated to testify, at least in part, because of the prospect of criminal prosecution and that (2) their involvement in the conspiracy, as disclosed by their testimony, when compared with the conduct alleged against defendants in the indictment, indicated that the witnesses were less culpable than defendants in the overall conspiracy. This comment is proper argumentation based on the evidence before the jury and does not amount to improper vouching for the credibility of witnesses or a personal opinion as to the guilt of the defendants.

Finding no evidence of prosecutorial misconduct, we need not reach the issue of whether the comments in question were likely to have prejudiced Appellant by altering the outcome of the case. *United States v. Rodriguez–Estrada,* 877 F.2d 153, 159 (1st Cir.1989).

## V. CHALLENGES RAISED SEPARATELY BY KENNEY

### A. The Court's Denial of Motion to Dismiss Indictment Under Interstate Agreement on Detainers

 Appellant Kenney argues that the district court erred in refusing to dismiss his indictment under the Interstate Agreement on Detainers Act, § 2, Art. IV, 18 U.S.C.App. ("IAD" or "Act"). The IAD establishes procedures for transfer of prisoners incarcerated in one jurisdiction to the temporary custody of another jurisdiction where criminal charges are pending. It sets time limits for trying prisoners transferred under its provisions, with the purpose of encouraging the "expeditious and orderly disposition" of outstanding charges. IAD, Art. I.

Kenney argues that the indictment should have been dismissed based on the following violations of the IAD:

*Violation of Art. IV(a),* which provides for a thirty-day period "after receipt by the appropriate authorities before the request [for temporary custody] be honored, within which period the Governor of the sending State may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner";

*Violation of Art. IV(d),* which indicates that the Act does not deprive a prisoner of any right to contest the legality of his extradition to the receiving state;

*Violation of Art. IV(c),* which provides that "trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

Kenney failed to raise Articles IV(a) and IV(d) as a basis for his motion to dismiss below; hence, he has waived those arguments pursuant to Fed.R.Crim.P. 12(b) and 12(f). We have considered whether these claims constitute plain error and have concluded that they do not.

Kenney did raise Art. IV(c) on several occasions as a basis for objecting to motions for continuances filed by codefendants and ultimately in a motion to dismiss his indictment, arguing that the court failed to try him within 120 days of his appearance in the jurisdiction of New Hampshire. Kenney was brought to the District of New Hampshire on May 7, 1992, and trial, pursuant to a strict application of the 120–day deadline, should have commenced on September 8, 1992.[25]

In denying Kenney's motion to dismiss, the judge indicated that continuing the trial until October 5 did not violate the 120–day provision because the clock had been tolled for twenty-eight days, from August 4 through August 31, 1992, while the magistrate judge resolved pretrial motions filed by Kenney. The judge also ruled that delays attributable to the disposition of motions filed by other co-defendants constituted "good cause" under the IAD and were also excluded from the computation.

This Court has recently suggested that delay caused by a court's resolution of pend-

---

**25.** September 5, 1992, was exactly 120 days, but that date fell on a holiday weekend.

ing co-defendant motions *may* qualify as excludible time under Article IV(c) of the IAD which states, "for good cause shown in open court ... the court ... may grant any necessary or reasonable continuance." *Whiting v. U.S.*, 28 F.3d 1296, 1306 (1st Cir.1994). However, the facts of this case allow us to affirm the court's denial of Kenney's motion to dismiss on a narrower ground; *i.e.*, that delay attributable to the disposition of motions filed by the defendant, himself, is excludible from the 120–day computation.

■ Art. VI(a) of the IAD provides that the 120–day clock "shall be tolled whenever and for as long as the prisoner is unable to stand trial." This Court has generally interpreted this provision to allow for tolling during the time that it takes for the court to resolve matters raised by the defendant who is claiming rights under the IAD. *Whiting*, 28 F.3d at 1307–08; *United States v. Walker*, 924 F.2d 1, 5–6 (1st Cir.1991), *United States v. Taylor*, 861 F.2d 316, 321–22 (1st Cir. 1988). We have held out the possibility, however, that where a defendant timely advises the court that he or she is claiming protections under the IAD *and* the court takes more time than is necessary to resolve the defendant's pretrial motions, then the delay may not be fully excluded from the 120–day clock.

In this case, Kenney first informed the court on June 5 that he refused to waive any rights under the IAD in response to a Government motion relating to bail. On August 4, he filed seven pretrial motions but did not refer to his reliance on the IAD to notify the magistrate that an expedited decision was, perhaps, warranted. The Government submitted responses on August 14, and the magistrate ruled on the motions on August 31. Kenney informed the court that he was specifically relying on the 120–day trial provision on September 1, when he filed objections to motions by co-defendants seeking a continuance of the trial date.

In these circumstances, the Court finds that a 28–day delay in resolving defendant's own motions was not unreasonable and that

after excluding this delay, trial was properly commenced within the 120–day deadline.[26] Accordingly, we affirm the district court's denial of Kenney's motion to dismiss his indictment.

**B. The Court's Admission into Evidence of Semi–Automatic Handgun**

■ Appellant Kenney challenges the court's admission into evidence of Government exhibit 42, a .32 caliber semi-automatic handgun. Specifically, Kenney argues that the Government failed to introduce sufficient evidence that (1) the gun had not been altered subsequent to the crime and (2) the gun was the actual gun used in the crimes in question. We need not belabor the point because we find that the district court did not abuse its discretion in admitting the handgun.

Federal Rule of Evidence 901(a) requires the trial court to determine if there is a "reasonable probability" that the evidence is what it is purported to be. Evidence before the court indicated that the gun had been stored in a garage for thirteen days. Even though the garage was used as a storage facility by several people, testimony at trial indicated that a co-conspirator's relative retrieved the handgun from the same place that it had been left by Kenney and Flynn. Considering the nature of the handgun, circumstances surrounding its preservation, and the scant likelihood of intermeddlers, the judge properly determined that it was in substantially the same condition.

The trial court also did not abuse its discretion in determining that there was a reasonable probability that the handgun was the same gun used in the robberies. Three co-conspirators identified the handgun, and a co-conspirator's relative identified the case in which the handgun was found and testified that she heard Flynn tell Kenney to hide the case in the garage. In addition, testimony by witnesses to the robberies described a gun matching the Government's exhibit.

---

**26.** According to this Court's calculations, the 120–day period, excluding the twenty-eight-day delay occasioned by defendant, ran on October 3, 1992, which was a Saturday. Trial was properly commenced on the first day of the business week, October 5, 1992.

## VI. SEPARATE CHALLENGES RAISED BY APPELLANT NEAL

### A. Sufficiency of Evidence to Support Guilty Verdict on Counts Alleging Accessory After The Fact and Money Laundering

██ Appellant Neal challenges the sufficiency of the evidence in support of the jury's guilty verdicts on Counts 30 and 31.[27] This Court finds that the evidence, viewed in the light most favorable to the Government, together with all legitimate inferences, was of such a *quantum* that a reasonable trier of fact could find Neal guilty beyond a reasonable doubt on both counts.[28] *United States v. Browne,* 891 F.2d 389, 393 (1st Cir.1989).

### B. Court's Denial of Motion for Downward Adjustment of Base Offense Level

██ Neal challenges the district court's denial of his motion for a downward adjustment of his Base Offense Level pursuant to section 3B1.2(a) of the Sentencing Guidelines. U.S.S.G. § 3B1.2(a). That section of the Guidelines provides for a four-level reduction where the court determines that a defendant was a minimal participant in the offense for which he was convicted and is intended to cover only those defendants who are clearly the least culpable of those involved in the criminal conduct of the group.

*See* U.S.S.G. § 3B1.2(a), comment nn. 1 & 2. Absent a mistake of law, a district court's finding as to whether a defendant was a minor or minimal participant will be reversed only if clearly erroneous. *United States v. Brum,* 948 F.2d 817 (1st Cir.1991).

██ Here, the court's determination was not clearly erroneous and we affirm. Neal mistakenly refers to the overall conspiracy encompassing five robberies as the benchmark for arguing that he played a minimal role. But section 3B1.2 focuses on the role of a defendant with respect to the offense(s) *of which he was convicted.* Here, Neal was convicted of money laundering and being an accessory after the fact. He was the only defendant indicted and convicted on the count of being an accessory after the fact and was indicted and convicted jointly with Flynn on the money laundering count. The facts support the court's determination that Neal did not play a minimal role with respect to the conduct alleged in either count.

## VII. CONCLUSION

Accordingly, the Court affirms the district court's rulings on all issues raised on appeal *except* the issue raised by Appellant Flynn regarding the court's denial of various motions for production of witness statements under the Jencks Act and the issue raised by Appellant Neal regarding the court's order of

---

**27.** Count 30, alleging accessory after the fact in violation of title 18 U.S.C. § 3, requires proof beyond a reasonable doubt that a defendant (1) knew an offense had been committed against the United States; and (2) "receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment...."

Count 31, alleging money laundering in violation of title 18 U.S.C. § 1956(a)(1)(B)(i), requires proof beyond a reasonable doubt that a defendant knew that:

the property involved in a financial transaction represents the proceeds of some form of unlawful activity [and] conducts such a financial transaction which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity....

**28.** The evidence consisted, in part, of testimony indicating that Neal was at his home on several occasions when co-conspirators met to discuss

the bank robbery and to make final preparations for committing the crime. The co-conspirators took refuge in Neal's home immediately following the robbery with a reasonable inference from the testimony being that Neal opened his cellar door to let them in. Neal followed Flynn's instructions to "go out and get the box of money" out of the car, with the box also containing the gun used in the robbery. Tr. (October 14, 1992) at 40. Neal was given between $2000–$5000 as his split from the proceeds of the robbery. Flynn later furnished him with additional money from the robbery to pay off hundreds of dollars in parking tickets and to purchase a car in his name to be used by Flynn and Kenney to drive to Arizona and eventually to California. A friend of Neal's testified that he told her he had won the money used to purchase the car by betting on football games and had purchased the car with the intention of letting a friend use it for a week or so.

restitution against him. We will retain appellate jurisdiction to enable us to review the augmented record and the court's subsequent determinations on the Jencks Act and restitution claims.

With respect to Appellant Flynn's challenge, we remand the case for an evidentiary hearing to determine whether statements were improperly withheld from him during trial in violation of the Jencks Act and, if so, whether nondisclosure of such statements constituted harmless error. With respect to Appellant Neal's challenge, we remand the case so that the court may determine whether the full amount of damages suffered by First N.H. was caused by the criminal conduct underlying Appellant's convictions for money laundering and being an accessory after the fact. The court should report its findings and determinations back to us within ninety (90) days. We will retain appellate jurisdiction for the time being.

*It is so ordered.*

## ATTACHMENT

### *APPENDIX I: LISTING OF JENCKS ACT RULINGS TO BE RECONSIDERED ON REMAND*

Below find examples where the court indicated that it was denying Jencks Act requests on the ground that there was no showing that the witness had seen and adopted the statements pursuant to 18 U.S.C. § 3500(e)(1). The court failed to make the further inquiry, pursuant to 18 U.S.C. § 3500(e)(2), of whether the notes or interview reports of government agents, requested by counsel, contained statements that were substantially verbatim recitals of a witness' prior statements. Rulings made pursuant to this erroneous standard include the following:

(1) After the Government conducted direct examination on Anita Ramsdell, a teller at First N.H., Appellant's counsel requested all Jencks material on the witness. The court indicated:

I looked at it and it's not Jencks material.... But I can't really rule on it at. this point until somebody asks her the question if she's ever seen it.

Tr. (October 9, 1992) at 6. Cross-examination by Appellant's counsel indicated that an FBI agent took notes for a half hour to forty-five minutes while the witness was being questioned by a detective from the Stratham police department but she further testified that she never saw the notes. *Id.* at 34–37. It is presumably on this basis, that witness Anita Ramsdell never saw or adopted the notes, that the court denied counsel's Jencks request.

(2) While Appellant's counsel was conducting cross-examination upon Richard Ferguson, a co-conspirator who pled guilty and cooperated with the Government, Ferguson testified that he met with Government attorneys Patrick Walsh and Robert Veiga and someone from the FBI on at least two different occasions and that Walsh was probably taking notes. Counsel asked for a sidebar:

Counsel: There are four to six hours of statements that someone took notes on.... I would suggest that there must be some Jencks material....

Court: So far I can't agree with you, counsel, but your objection is noted.

Tr. (October 14, 1992) at 140.

On further cross-examination of Ferguson, he testified. that Government attorney Walsh went over the same things with him in the second interview that were covered in the first interview. Counsel again asked for a sidebar requesting that the court order the Government to turn over materials from the first interview based on the witness' testimony that he went over these materials with the Government attorney:

Government: Your Honor, it is not. I mean all he said so far is that—as I remember his testimony—is that he went over the same things in each interview.

Court: That is my understanding, but the objection of the defense is noted.

Counsel: Your Honor, wait a minute. Unfortunately I must admit I don't understand what's going on here, but I am trying to figure it out. Am I to understand that at some point is work product

being interposed here for the basis of why we are not getting these materials?

. . . .

Counsel: The reason is that you have been given documents which you have reviewed, and within those documents somehow he has never adopted them, so that's why we don't get them?

Court: The record before me is that he has never adopted those documents.

. . . .

Court: If I am wrong I will be reversed. Your objection is noted.

. . . .

Counsel: I want the record to reflect that in my opinion what I now understand is that this is a very clever manipulation of the rules by the United States Government in the District of New Hampshire to avoid ever giving Jencks material, because what we do is if we never ask the witness to adopt it, that if there is no steno present, we can clearly say there is not Jencks material. . . .

Tr. (October 14, 1992) at 152–53.

(3) The court denied production of Jencks material on witness Linda Sherouse who worked at the Dress Barn retail store and was victim of a night deposit robbery. When Sherouse was testifying on direct examination with respect to the gun used by the robber, counsel asked for a side bar:

Counsel: Now I'd like to know where her Jencks material is. Where's her statements? Where's a description of this? Where's a prior statement of this or why hasn't she been shown this?

Government: She gave a statement at the time of the incident to the local authorities, which was Hampton Police Department I guess. But there has been no Jencks material with respect to that.

. . . .

Court: Why don't you give him the statement she made to the Hampton cops.

Government: She hasn't reviewed it. She hasn't reviewed it. It's not Jencks.

Court: Can I review it?

Government: Sure, certainly.

. . . .

Court: For the record, I have reviewed them and I don't think there's either Jencks or Brady material in them.

Tr. (October 27, 1992—Afternoon session) at 86–88.

(4) Other examples where the court may have used an erroneous legal ground in denying Jencks requests include a request for Jencks material on Douglas Scamman. Scamman is a dairy farmer who identified Appellant Flynn in court as one of several men whom he observed on various occasions loitering near a field that was allegedly used by the armed robbers to reach and escape from First N.H. Counsel asked the court to order production of Jencks or Brady material with respect to statements made by Scamman that might be included in a report filed by a Sergeant Forbes. The court denied the request. Tr. (October 19, 1992) at 171–73.

The court also denied a Jencks Act request for statements made by co-conspirator Arthur Cosgro who cooperated with the Government. Counsel indicated that he had been given no materials that would shed light on testimony by Cosgro with respect to a particular conversation that he had with Appellant Flynn. Counsel questioned whether the basis of the statement should have been disclosed in his Jencks Act request. Tr. (October 20, 1992) at 73–77.

The court denied Jencks Act requests on prior statements contained in reports of interviews with co-conspirators Thomas McQueeney and Brian Raineri, both of whom cooperated with the Government. It is unclear whether an erroneous legal ground was used in these denials. Tr. (October 28, 1992) at 20 and Tr. (November 3, 1992) at 219–20.